IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 1, 2014

## STATE OF TENNESSEE v. ANTHONY HENVEY aka ANTHONY HERVEY

**Appeal from the Criminal Court for Shelby County**
**No. 11-05726      W. Mark Ward, Judge**

## No. W2013-00654-CCA-R3-CD - Filed June 5, 2014

A Shelby County Criminal Court Jury convicted the appellant, Anthony Henvey aka Anthony Hervey, of attempted second degree murder, a Class B felony, and possession of a weapon during the commission of a dangerous felony, a Class C felony, and he received an effective sixteen-year sentence. On appeal, the appellant contends that the evidence is insufficient to support the attempted murder conviction and that the trial court erroneously instructed the jury on self-defense. Based upon the record and the parties' briefs, we conclude that the self-defense instruction was erroneous but that the error was harmless. Therefore, the appellant's convictions are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Tony N. Brayton (on appeal) and Brent Walker (at trial), Memphis, Tennessee, for the appellant, Anthony Henvey aka Anthony Hervey.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Amy P. Weirich, District Attorney General; and Megan Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I.  Factual Background

At trial, Officer Joe Criner of the Memphis Police Department (MPD) testified that on the afternoon of May 28, 2011, he was dispatched to a home on Maumee Street. When he arrived, the victim, Andrew Gillard, came out of the home and into the yard, where he fell. Officer Criner saw that the victim had a gunshot wound to the stomach, and the victim said that he had been shot by the appellant. The victim described the appellant, and Officer Criner relayed the description over the police radio. Later, but before paramedics transported the victim to the hospital, the appellant was brought to the scene in a patrol car. He did not have a gun but told Officer Criner that he shot the victim.

On cross-examination, Officer Criner testified that he and his partner were the first officers on the scene. The victim may have been outside when they arrived.

MPD Officer Vornell Montgomery, Officer Criner's partner, testified that when he and Officer Criner arrived at the home on Maumee Street, he knocked on the front door. The victim opened the door and said, "'He shot me.'" The victim fell into Officer Montgomery's arms, and Officer Montgomery noticed that the victim had a gunshot wound to his mid-section. Officer Montgomery laid the victim on the ground and left the area to search for the suspect, who had been described as wearing a red shirt. Officer Montgomery learned that officers had arrested the suspect down the street and went to that location. The suspect, who was the appellant, was lying between a car and the street curb, and officers were getting him off the ground. Although the appellant was wearing a white t-shirt, a red shirt was underneath him. He told Officer Montgomery that he shot the victim and that he would lead the officers to the gun. The appellant took the officers to a yard with very tall grass, and the officers searched the yard but never found the weapon. They put the appellant into the back of a patrol car and returned him to the home on Maumee Street.

Officer David Smith of the MPD testified that he went to the crime scene on Maumee Street to take photographs and collect evidence. He found a lithium battery for a cellular telephone on the ground between two houses, and the battery appeared to have a bullet hole in it. He also found a black Cricket cellular telephone and the back of a cellular telephone, both of which appeared to have a bullet hole in them. Officer Smith went to a second crime scene on Chickamauga Avenue, which was about five houses away from the first crime scene, and found a red shirt and a hat. He went to a third crime scene on Tahoe Road to look for a gun. He used a metal detector to search for the gun but could not find it due to the tall grass.

On cross-examination, Officer Smith testified that he was not present when officers arrested the appellant on Chickamauga Avenue. He acknowledged that he did not find any evidence at the victim's address on Maumee Street. He never found any bullet casings or a

walking stick.

Sergeant Byron Braxton of the MPD testified that he went to the scene on Maumee Street to investigate the shooting. When he arrived, the suspect was in the back of a patrol car. Sergeant Braxton said that the suspect was "sweating profusely" and "really excited" and that he decided not to talk with the suspect that day "due to the state of agitation." Sergeant Braxton spoke with Sergeant Frank Hannah, who had gone to the hospital to speak with the victim. The victim told Sergeant Hannah that "Wayne shot him." Sergeant Braxton said that the suspect's name was Anthony Dewayne Hervey and that "[s]o we [were] more than likely talking about the same person." Sergeant Braxton had the suspect transported to jail and placed on a "48 hour hold." On cross-examination, Sergeant Braxton testified that he did not see a stick at the crime scene.

Tony Stevenson testified through an interpreter for the deaf that he was the victim's friend, that he lived across the street from the victim, and that the victim looked out for him. He said that he and the appellant had mutual friends and that he had seen the appellant "around." In May 2011, Stevenson and the appellant were in a dispute over $60 that Stevenson owed the appellant for crack cocaine. Stevenson said that he asked the appellant to wait until the first of the month for the money but that the appellant "kept coming on." One time, the appellant pointed a knife at Stevenson's face, and Stevenson thought the appellant was going to cut him. Stevenson said he was afraid of the appellant because he thought the appellant might try to kill him and that he told the victim about the debt and the knife incident. On May 28, 2011, Stevenson was not home. He had left his home with the lights turned off and the front door closed and locked. He said that when he returned home, the door was "wide open" and the lights were on.

On cross-examination, Stevenson testified that although he was deaf, he could "talk some." He spoke with the victim about the appellant but denied telling the victim to "go get" the appellant. He acknowledged that the appellant seemed angry with him but that the appellant never physically harmed him. He also acknowledged that he smoked crack cocaine and that his house was a gathering place for people, including the victim, to smoke it.

Sergeant Frank Hannah of the MPD testified that on May 28, 2011, he went to The Med to speak with the victim. The victim told Sergeant Hannah that he had a confrontation with a man he knew as "Wayne" about a drug deal between Wayne and the victim's friend, "Dumb-Dumb." The victim claimed Wayne shot him without any provocation or notice. Sergeant Hannah telephoned Sergeant Braxton, who advised him that the police had detained a suspect named Anthony Dewayne Hervey. Sergeant Hannah returned to the police department, ran the name through the "W.A.S.P. system," and located information about the appellant and a photograph. Sergeant Hannah created a six-photograph array, returned to the

hospital, and showed it to the victim. The victim pointed to the appellant's photograph. The victim was in intensive care for 30 to 40 days and then had to recuperate at home, so Sergeant Hannah did not take his statement until July 2011. The victim's statement was consistent with what he had told Sergeant Hannah in the hospital.

Sergeant Hannah testified that on May 30, 2011, he spoke with the appellant. The appellant waived his Miranda rights and gave a statement. In the statement, the appellant said he was the shooter and did not regret shooting the victim. The appellant claimed that he was not a drug dealer but that he sold cocaine to a man he knew as "Dumb-Dumb." The man was nicknamed Dumb-Dumb because he was deaf and dumb. The appellant told Sergeant Hannah that the day before the shooting, he had threatened to cut Dumb-Dumb's ears and throat with a drywall cutter. Afterward, the victim telephoned the appellant, told him to leave Dumb-Dumb alone, and told him that they would try to come up with some kind of arrangement. The victim asked the appellant to come to his house so they could talk about the situation. The appellant went to the victim's home, and the victim was on the porch. Their discussion became heated. The appellant called the victim names and threatened him, and the victim hit the appellant with a stick he was carving. The appellant left the porch and threw two bricks at the victim. The first brick missed, but the second hit the victim. The victim told the appellant that "'Dumb-Dumb don't owe [you] shit,'" and the appellant answered, "'[N]o Dumb-Dumb don't owe me shit, you owe me now.'"

Sergeant Hannah testified that according to the appellant's statement, the appellant removed a handgun from his waistband, wrapped a towel around it, and went to Dumb-Dumb's house. He kicked open the door, looking for Dumb-Dumb, but Dumb-Dumb was not home, so the appellant walked toward the appellant's cousin's house, which was "diagonally across the street." The appellant said he was going to get his tools from his cousin's house because he "knew there was gonna be trouble down the street." The victim saw the appellant and threatened to call the police, and the appellant told him to "go ahead." The victim "came at" the appellant with the stick, and the appellant shot at the victim. At first, the appellant thought he had missed the victim because the victim was about seven feet away. The victim turned around and came at the appellant a second time, and the appellant shot him again. After the fifth or sixth shot, the victim grabbed his stomach. The appellant told Sergeant Hannah, "'I don't know how many times I shot, because he kept coming at me.'"

Sergeant Hannah testified that the appellant said he ran behind a vacant house after the shooting and threw the gun and towel in a large grassy area. The appellant hid inside a car, but the car was too hot, so he got out of the car, took off his hat and shirt, and lay down in the gutter between the curb and the car, where the police found him. Sergeant Hannah said that the appellant never claimed he was afraid of the victim and that after the appellant

-4-

gave the statement, the appellant "made it real clear that he hoped that Mr. Gillard dies and if he didn't, if he gets the chance he is going to shoot him again and make sure he kills him next time." Sergeant Hannah said the appellant shot the victim for "sticking his nose in his business and his business dealings with Dumb-Dumb." Sergeant Hannah stated that the appellant may have wrapped the gun in the towel to conceal it, muffle it, and/or catch the casings so that the police could not collect them as evidence.

On cross-examination, defense counsel showed Sergeant Hannah the appellant's statement. Sergeant Hannah acknowledged that the appellant's comment about shooting the victim for sticking his nose in the appellant's business was not in it. Sergeant Hannah stated that some of the appellant's comments were not included in the statement because "he said stuff in the pre-interview that he didn't repeat in the oral statement." When Sergeant Hannah spoke with the victim, the victim admitting hitting the appellant with the stick. Sergeant Hannah said that hitting someone with a stick could be a crime but that the victim was not charged in this case.

On redirect examination, Sergeant Hannah testified that the appellant was nice and very calm when the interview began but that the appellant became angry and agitated when the appellant spoke about the victim. Sergeant Hannah acknowledged that according to the appellant, the victim ran, but the appellant kept shooting at him. When the victim could not get back to the victim's house, the appellant shot him again. On recross-examination, Sergeant Hannah acknowledged that the appellant also said in the statement that he was on his way to his cousin's house before the shooting occurred. Sergeant Hannah acknowledged that the shooting did not take place at the victim's home.

The victim acknowledged that he had a prior conviction for burglary and served time in prison. He testified that he knew Tony Stevenson as "Dumb-Dumb" and the appellant as "Wayne." Stevenson and the appellant had been involved in drug dealings, and there was tension between them. The victim telephoned the appellant about the situation, and the appellant said he would come to the victim's house. The appellant first came to the victim's house about 7:00 a.m. on the day of the shooting. The appellant returned about 10:00 or 11:00 a.m. while the victim was whittling a walking stick on his front porch. The victim said that he and the appellant began talking about Stevenson's debt and that "all of a sudden, [the appellant's] persona, just changed." The appellant began to sweat and curse, and the victim got upset. The appellant called the victim a "bitch" and told the victim to stay out of his business. The victim stood up and hit the appellant with the walking stick one time because the appellant had disrespected him. The appellant ran, and the victim chased him for twenty or thirty feet. The appellant stopped, picked up two bricks, and threw them at the victim but missed. The appellant told the victim, "I won't miss next time." The victim turned around and walked home.

The victim testified that later that day, he went to a friend's house on Tahoe Road. As he was walking home, he saw the appellant kick in Stevenson's front door. The victim yelled at the appellant and told the appellant that he was calling the police. The appellant came out of the house, walked around the mailbox, and shot at the victim three times. The victim ran between two houses and began calling 911 with his cellular telephone. The appellant shot at him again, shooting the phone out of his hand. The victim was about fifteen feet from the appellant and threw his walking stick at the appellant, hitting the appellant's back. The appellant shot at the victim. The victim said that the appellant shot at him a total of nine or ten times and that he was hit three times, twice in the stomach and once in the hand.

The victim testified that after the shooting, he returned home and told his fiancé to call the police. The victim was transported to The Med, had surgery, and spoke with Sergeant Hannah in intensive care. Sergeant Hannah showed him a photograph array, and the victim picked out the appellant's photo. The victim had two surgeries, one to repair his stomach and remove his spleen and one for internal bleeding, and spent 30 days in the hospital. He said that he could no longer stand for long periods of time, that his balance was "off," and that he stumbled when he walked. He said that as the appellant was shooting at him, the appellant said, "You won't die. Why won't you die?"

On cross-examination, the victim acknowledged that during his encounter with the appellant on the front porch, he may have hit the appellant with the stick more than one time. He also acknowledged that he hit the appellant because he was angry, not because he was afraid. At the time of the shooting, the victim weighed about 225 pounds. He said that he was right-handed but that he was holding his cellular telephone in his left hand when the appellant shot at him. One of the bullets hit the victim's left hand and cell phone. The victim was holding the walking stick, which was about six feet long, in his right hand. He denied that he ran toward the appellant or that he was going to hit the appellant with the stick. He said he did not know if he had been shot when he threw the stick at the appellant. He said that he and Stevenson were friends, and he acknowledged that he refused to speak to defense counsel's investigator. At the conclusion of the victim's testimony, the State rested its case-in-chief.

Melinda Smith, the appellant's cousin, testified for him that at the time of the shooting, her daughter and granddaughter lived in a house on Maumee Street. On the day of the shooting, Smith drove to the house to pick them up for a movie. She said that when she arrived, she saw "a lot of commotion going on" and heard people saying, "'Wayne Logan did it, Wayne Logan did it.'" The appellant was in the back of a patrol car and told her, "'Cuz, I am okay.'" A few feet from the mailbox, Smith saw a stick on the ground. She notified a police officer about the stick.

The appellant testified that on May 28, 2011, he did not live on Maumee Street but was in the area to mow yards. The victim telephoned the appellant and said he needed to speak with the appellant but did not say what he wanted to discuss. The appellant walked to the victim's house. He had an unloaded gun and a loaded clip in his waistband. He said he had the gun because he had been shot at previously. He usually kept the gun in his car but did not want to leave the gun in the car for someone to steal. When the appellant got to the victim's home, the victim "came from around the side of the house" and asked if the appellant had been to Tony Stevenson's home. The appellant said yes and, "[W]hat do you have to do with it?" The victim hit the appellant three times with a stick, striking the appellant's arm, wrist, and shoulder and leaving a knot on his wrist. The appellant described the stick as "a handmade stick that he had been carving on. It was thick and it was long." The appellant ran, and the victim pursued him. The appellant picked up two bricks and threw them at the victim. One brick missed, but the second brick may have hit the victim's leg. The appellant said he was "furious" but did not pull the gun out of his waistband. He said he wrapped a towel around his wrist.

The appellant testified that he loaded his gun and went to Stevenson's house, which was directly across the street from the victim's house, to confront Stevenson about involving the victim in their dispute. He kicked in the door, but Stevenson was not home, so he walked back across the street "at an angle" to his cousin's house. The appellant had the gun in his hand but had no intention of using it on Stevenson or anyone else.

The appellant testified that when he got to his cousin's house, he saw the victim. The victim told him that "you kicked his door in and I am going to call the police." The appellant told the victim to go ahead. He said that the victim came close enough to hit him with the stick and that the victim hit his back with the stick while his back was turned. The appellant was holding the gun down and had not pointed it at the victim.

The appellant testified that when he turned around, the victim was holding up the stick again, so he shot the victim. The appellant said he did not see a cellular telephone in the victim's hand and was in fear for his life because the victim was "a big guy." At that time, the appellant was five feet, eleven inches tall and weighed 150 to 155 pounds. He said that he fired the gun three or four times, that he did not know he had shot the victim, and that the victim did not fall but retreated. The appellant did not chase the victim. However, the victim returned with the stick raised, so the appellant shot at him. The victim told the appellant he had been shot and held his stomach. The victim went toward his house, and the appellant went to Tahoe Road. He threw the gun away and took off his shirt because he was sweating profusely. He then sat on the curb to wait for the police. When the police arrived, he turned himself in. The appellant told the officers what had happened and showed them exactly where he threw the gun. The police took him to Maumee Street, and he tried to show them

the location of the walking stick. Defense counsel asked the appellant if he intentionally tried to kill the victim, and he said no.

On cross-examination, the appellant acknowledged that when he first went to the victim's house, he had no idea what the victim wanted to discuss. He also acknowledged that he did not tell Sergeant Hannah that the victim hit his wrist, causing it to swell, or that his gun was unloaded. He said he did not remember telling the victim that "you owe me now." He acknowledged that he was mad at Stevenson when he went to Stevenson's home and that Stevenson had not invited him there. After the appellant shot at the victim, the victim ran away. However, the victim "turned around and came back at" the appellant. The appellant acknowledged that he did not have a license to carry the gun, a nine millimeter semiautomatic, and that he fired at the victim until the clip was empty. He said he did so because he was afraid for his life and that he told the officers he shot the victim because he was scared. Prior to firing his gun, he wrapped the towel around his wrist; the gun was in his hand.

The appellant denied selling crack cocaine to Stevenson. He said he gave the drug to Stevenson but loaned Stevenson money. He acknowledged initialing every page of his statement and signing the statement. He said, though, that Sergeant Hannah "said some things in here that wasn't on that paper" and that Sergeant Hannah paraphrased what he told the officer. He said that he was upset and confused when he gave his statement, that he may have referred to the victim as a "shyster" in the statement, and that he may have cursed in the statement. He acknowledged that he used to live in California and said that he was convicted in that state of robbery or attempted robbery.

Greg Flint testified on rebuttal that he was a criminal investigator for the Shelby County District Attorney General's Office, that he used to work as a Collierville police officer, and that he had training and experience with handguns. He stated that in order for a semiautomatic handgun to fire, the clip had to be inserted into the gun, and the shooter had to pull back and release the slide. On cross-examination, Flint testified that it was possible the gun could fire one round without the clip being in the gun.

At the conclusion of the appellant's testimony, the jury convicted him as charged of attempted second degree murder, a Class B felony, and possession of a weapon during the commission of a dangerous felony, a Class C felony. After a sentencing hearing, the trial court sentenced him as a Range I, violent offender to ten years for the attempted murder conviction and as a Range I, standard offender to six years for the possession of a weapon conviction. The trial court ordered that the appellant serve the sentences consecutively for a total effective sentence of sixteen years.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support his conviction for attempted second degree murder, arguing that the victim instigated the shooting by hitting him with the walking stick, that the shooting was the result of a quarrel and combat, and that he only intended to stop the victim from "continuing to beat him" with the stick. In support of his argument, the appellant claims that when he realized the victim had been wounded and was no longer a threat to him, he stopped firing his weapon. He also asserts that, at most, he is guilty of attempted voluntary manslaughter. The State argues that the evidence is sufficient to support the conviction. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Second degree murder is the knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-11-106(a)(20). Criminal attempt requires that one act "with the kind of culpability otherwise required for the offense . . . [and] with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part." Tenn. Code Ann. § 39-12-101(a)(2).

The appellant is claiming that he acted in self-defense. Tennessee Code Annotated section 39-11-611(b)(2) provides that

Notwithstanding § 39-17-1322,[1] a person who is not engaged in unlawful activity and is in a place where the person has a right to be has no duty to retreat before threatening or using force intended or likely to cause death or serious bodily injury, if:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;

> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and

> (C) The belief of danger is founded upon reasonable grounds.

Self-defense is a fact question for the jury. State v. Clifton, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993). When a defendant relies upon a theory of self-defense, it is the State's burden to show that the defendant did not act in self-defense. State v. Sims, 45 S.W.3d 1, 10 (Tenn. 2001).

Taken in the light most favorable to the State, the evidence shows that on May 28, 2011, the appellant and the victim got into an altercation on the victim's porch and that the victim struck the appellant with the walking stick. The appellant ran away from the victim, went to Tony Stevenson's home, and kicked in the front door to confront Stevenson. Stevenson was not there, so the appellant walked to his cousin's house. The victim, seeing that the appellant had kicked in Stevenson's door, told the appellant that he was calling the police. The appellant wrapped a towel around his gun and began shooting at the victim, shooting the cellular telephone out of the victim's hand. The appellant fired the gun nine or ten times, striking the victim once in the hand and twice in the stomach.

Although the appellant claimed at trial that he shot the victim in self-defense, the appellant never claimed before trial that he believed he was in imminent danger of death or serious bodily injury. To the contrary, the appellant expressed to Sergeant Hannah that he

---

[1]Tennessee Code Annotated section 39-17-1322 provides, "A person shall not be charged with or convicted of a violation under this part if the person possessed, displayed or employed a handgun in justifiable self-defense or in justifiable defense of another during the commission of a crime in which that person or the other person defended was a victim.

was furious with the victim, that he wanted the victim to die for interfering in his business with Stevenson, and that, if the victim did not die, he was going to shoot him again and kill him next time. The victim testified that while the appellant was shooting him, the appellant said, "You won't die. Why won't you die?" Therefore, we conclude that the evidence is more than sufficient to support the appellant's conviction for attempted second degree murder.

## B. Self-Defense Instruction

Next, the appellant claims that the trial court's self-defense jury instruction was erroneous. Specifically, the appellant contends that the trial court should not have instructed the jury that he had been convicted of a felony, i.e., robbery or attempted robbery, in California; that the trial court should not have instructed the jury on robbery in California; and that the trial court should not have instructed the jury on federal laws. The appellant contends that the trial court's instructions were an incomplete statement of the law and constituted an improper comment on the evidence. The State argues that the trial court properly instructed the jury and that, in any event, the trial court's error was harmless. We conclude that the instruction was erroneous but that the error was harmless.

On the morning of trial, the prosecutor advised the trial court that the appellant had a prior robbery conviction in California for which "he did eight months on a three year sentence" and that "if he claims self defense, I will inquire about his robbery conviction . . . due to the fact that he would be unlawfully possessing a handgun." The trial court ruled that the State could not impeach the appellant with the conviction pursuant to Rule 609, Tennessee Rules of Evidence, because it was more than ten years old but stated that "I could also see if he gets on the witness stand and says, self-defense, it just makes it relevant to the case if he's a convicted felon that's carrying a weapon."

After the appellant announced that he was going to testify, the prosecutor reminded the trial court that "if he does raise self-defense, then I can question him about that, due to the fact that he has to be acting lawfully." The appellant interjected, "I haven't been convicted of a felony. . . . I pled to a lesser offense." Defense counsel advised the court that counsel had not seen a certified copy of the conviction, and the trial court asked the prosecutor if she had a certified copy. The prosecutor answered no but said that she was trying to obtain one and that her investigator could testify that "he has spoken to people that we are getting the certified copy from that have, in fact, verified that Mr. Hervey was convicted of robbery in 1995 and he was sentenced to three years." The appellant stated, "I committed a robbery, we'll put it at that, that's what it is, or whatever." The prosecutor stated that a National Crime Information Center (NCIC) report confirmed the conviction. Defense counsel refused to stipulate to any prior conviction because the appellant "[was] not

-11-

certain," and the trial court noted that the investigator's testimony would be hearsay. The trial court then stated as follows:

> And unfortunately the law says that he has to be acting lawfully [to claim self-defense] and I am assuming that the proof is going to come out that he was carrying some kind of handgun, when he was a convicted felon.
>
>      . . . .
>
> [T]he state has a right to try to prove that he is a convicted felon.
>
>      . . . .
>
> I said it can't be used for 609, but there are numerous criminal offenses that involve felons carrying weapons.
>
>      . . . .
>
> And I would say that in this case the state has a good faith belief that he is a convicted felon and they [ought] to be able to cross-examine him about his convictions in California, that he now, miraculously claims he has no clue what charge he pled to, or went to prison for, for six, or seven months.
>
>      . . . .
>
> I would say with N. C. I. C. reports and whatever else she has got and since this case went to trial with a notice of impeachment it listed in that notice of impeachment the . . . robbery out of California and now, all of a sudden, nobody knowing anything about it, you know, whatever, I just have to take it as it is.

The trial court took a break. When the parties returned to the courtroom, the trial court asked the prosecutor what evidence she had to prove the prior conviction. The prosecutor said she had the NCIC report, which showed the appellant's social security number, his conviction for robbery or attempted robbery, and his three-year sentence. The trial court allowed the prosecutor to voir dire the appellant, and he acknowledged that the social security number was his and that he pled guilty to attempted robbery. He said he did

-12-

not know attempted robbery was a felony. The trial court ruled that the State could ask the appellant on cross-examination if he had ever been convicted in California of robbery or attempted robbery but advised the State that "you're stuck with whatever his answer is." The State asked the court, "[I]f he continues in the vein of 'I don't know, I don't remember, or no', will I be given leave to try to continue to get the certified copy of the conviction?" The trial court agreed to recess the trial, if necessary, until the next day in order for the State to obtain the certified copy. The trial court then announced the following regarding the self-defense jury instruction:

> Well, I've doctored the pattern. The pattern doesn't say anything about this issue that we have before us. All the pattern jury instruction says is that you have to [be not] acting unlawfully. Well, it doesn't say anything about what the jury is going to do with those . . . words. It's just kind of subtle and it won't make any sense.
>
> Regardless of whether we've got felonies here, this is all an academic exercise because it is a misdemeanor in violation of State law to carry a weapon in an attempt to go armed, unless you have a permit.
>
> It is also a violation of Federal law to possess [a] gun that is not registered to you.
>
> . . . .
>
> [A]nd I don't know what the proof is and what he is going to say on cross-examination. I don't know if any of that stuff applies. For all I know he's got a permit, but I doubt it, if he got a felony conviction. But, we'll see[.]

During his cross-examination testimony, the appellant acknowledged that he lived in California in 1993 and that he was charged in that state with robbery. The State asked him if he was convicted of the charge, and the appellant answered, "My lawyer broke it down that it was a robbery, or attempted robbery, yes."

At the conclusion of the appellant's testimony, the defense rested its case, and the trial court sent the jury out for a brief recess. The trial court stated, "He wasn't certain, it was either robbery, or attempted robbery, . . . that is all that he testified to. I mean, do you think that that is enough for the jury question, as to whether he was convicted of robbery, or simple

-13-

robbery, if he testified to it[?]" Defense counsel argued that the trial court should not mention any conviction during the jury instructions because, without a certified copy of the judgment, the State failed to prove the appellant had been convicted of a felony. The trial court, reading from the California Penal Code, noted that robbery was defined as a "felonious taking" and that the punishment for attempted robbery was "imprisonment in state prison. I don't see a number of years associated with it." The trial court ruled as follows:

> All right. I am going to let the jury decide and y'all can argue that the proof is not there, [defense counsel] you are free to argue that the proof is not there, that this was a felony, or whatever you want to argue. But, I think that I can look on West Law and the public statutes of a state to determine what I have determined.

> . . . .

> I am going to leave it in the charge. I'll just let the jury decide and let y'all argue about whether or not it is a felony. And you can argue, whatever you want to argue, but I think that I have to explain to them that under California Law robbery and attempt robbery are felonies.

> . . . .

> What I am saying is, I'm not telling them about the N. C. I. C. report and I am not making my decision on the N. C. I. C. report, but if I looked up West California Code and it said robbery is a felony, then that N. C. I. C. report, at least, corroborates what I have looked up. Whatever that means.

> But, the N. C. I. C. report doesn't come in and she'll have to make an argument that [the State] has proven that he was convicted of it through his testimony and you'll have to argue that your client is not a lawyer and he doesn't know and you can't find beyond a reasonable doubt.

> But, I don't[] think that I should remove it from the jury's consideration.

> . . . .

Of course then, the question is, who should decide if he is not engaged in unlawful activity, me or the jury and I am thinking that the jury needs to make that call and not me.

And how do they decide whether he is engaged in unlawful activity without defining some crimes that might be. I don't want to comment on the evidence, but on the other hand, they've got to have the statutes in front of them to know whether he is acting unlawfully.

. . . .

And the question is, the only thing that I am doing is telling the jury it is up to them to decide whether he is acting unlawfully, which I think is a legitimate thing. And then, giving them the definitions of offenses that might be applicable. I am not saying that he committed these offenses. I am telling them that this is what the state has to prove in order to show that he committed these offenses so they can know what these definitions are.

And the three of these that involve felonies, I am telling them what California Law says, which is very similar to Tennessee Law. But, how are they going to know whether he is acting unlawful, if we don't ever define what potential crimes are he might, or might not be violating.

During the jury instructions, the trial court read the pattern jury instruction for self-defense, which essentially followed Tennessee Code Annotated section 39-11-611(b)(2) quoted in the section above on sufficiency of the evidence. The trial court also inserted the following language:

Self-defense is not available to a defendant who was engaged in unlawful activity at the time he or she is claiming self-defense. Whether a defendant was engaged in unlawful activity at the time he or she is claiming self defense is a question for the jury's determination.

[(a)] It is a violation of federal law and unlawful for any person who has been convicted in any court of a crime

-15-

punishable by imprisonment for a term exceeding one year to ship or transport in interstate or foreign commerce any firearm or ammunition, or to possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce. Under California law. Robbery is punishable by imprisonment for a determinate sentence from three to nine years.

(b) It is a violation of federal law and unlawful for any person to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer record.

(c) It is a violation of state law and unlawful for a person who has been convicted of a felony involving the use or attempted use of force, violence, or a deadly weapon to possess a firearm. In order to establish a violation of this provision the state would have to prove beyond a reasonable doubt that (a) a defendant had previously been convicted of robbery, (b) that the defendant, after such felony conviction, possessed a firearm, (c) that the defendant acted either intentionally, knowingly or recklessly and (d) that the felony involved the use or attempted use of force, violence or a deadly weapon. Under California law, robbery is a felony and is defined as the felonious taking of personal property in the possession of another, from his person or immediate presence and against his will, accompanied by means of force or fear.

(d) It is a violation of state law and unlawful for a person who has been convicted of a felony to possess a handgun. In order to establish a violation of this provision the state would have to prove beyond a reasonable doubt that (a) that the defendant had been convicted of robbery; (b) that the defendant, after such felony conviction, possessed a handgun; and (c) that the defendant acted either intentionally, knowingly or recklessly. Under California law, robbery and attempted robbery are felonies.

(e) It is a violation of state law for a person to unlawfully carry a weapon with intent to go armed. In order to establish a

violation of this provision the state would have to prove beyond a reasonable doubt that (a) the defendant carried a firearm; (b) that the defendant did so with intent to go armed and (c) that the defendant acted intentionally, knowingly or recklessly. Under Tennessee law, a person who has been convicted of a felony is ineligible to obtain a handgun carry permit.

Whether a defendant was engaged in unlawful activity at the time he or she is claiming self defense is a question for the jury's determination.

The appellant contends that the State did not have a good faith basis to ask him about the California conviction because the State was relying on the NCIC report, which our supreme court has ruled is not admissible as a substitute for a certified copy of a judgment of conviction. The appellant also contends that portions of the trial court's instruction on federal law, particularly the portions about shipping or transporting a firearm and receiving or possessing a firearm not registered in the National Firearms Registration and Transfer record, "completely misled the jury into believing the defendant had violated federal law." Finally, the appellant contends that the trial court's instructing the jury about robbery in California misled the jury into believing he had been convicted of that offense. In sum, the appellant argues that the instruction incorporated facts not in evidence and constituted an impermissible comment on the evidence.

A trial court in a jury case is obliged to provide a "complete charge of the law applicable to the facts of a case." State v. Harbison, 704 S.W.2d 314, 319 (Tenn. 1986); see also Tenn. R. Crim. P. 30(d)(2). "'Jury instructions must be reviewed in their entirety. Phrases may not be examined in isolation.'" State v. James, 315 S.W.3d 440, 446 (Tenn. 2010) (quoting State v. Rimmer, 250 S.W.3d 12, 31 (Tenn. 2008)). A charge "is erroneous if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." James, 315 S.W.3d at 446 (quoting State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997)). Whether a conviction should be reversed on the basis of an erroneous jury instruction is determined by "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" Rimmer, 250 S.W.3d at 31.

Regarding the NCIC report, such reports "are not admissible as a substitute for certified copies of court convictions nor for any other purpose." State v. Buck, 670 S.W.2d 600, 607 (Tenn. 1984). Moreover, the State may not use an NCIC report as a basis for impeaching a witness with a prior conviction." State v. Michael R. Smart, No. M2009-02262-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 268, at *10 (Nashville, Apr. 12, 2011) (citing State v. Philpott, 882 S.W.2d 394, 403 (Tenn. Crim. App. 1994)). However,

in the instant case, the State was not seeking to admit the NCIC report as evidence or impeach the appellant with it and was "stuck" with his answer. In any event, defense counsel did not object to the State's questioning the appellant about the conviction outside of the jury's presence, and the appellant admitted pleading guilty to attempted robbery. See Tenn. R. App. P. 36(a).

Regarding the jury instruction, even after the appellant admitted during his cross-examination testimony that he had a prior conviction for robbery or attempted robbery in California, the trial court was concerned that the State had failed to prove he had been convicted of a felony. The obvious and simple remedy for the trial court's concern would have been for the court to have ordered a brief recess, as the court had said it would, so that the State could obtain a certified copy of the judgment.[2] Instead, the trial court decided to let the jurors determine whether the appellant had been convicted of a felony by instructing them on portions of federal law, California law, and Tennessee law, much of which the jury had no way of determining was factually relevant to the appellant's prior conviction. In short, we are puzzled as to how the trial court could expect twelve jurors, presumably lay persons unversed in the law, to determine from the lengthy and somewhat convoluted instruction whether the appellant had been convicted of a prior felony in California and, therefore, was a felon in possession of a weapon on May 28, 2011. Thus, we agree with the appellant that the trial court's instruction to the jury was error.

We must now determine the effect of the error. An erroneous jury instruction is a non-structural constitutional error; accordingly, the test to determine whether the error is harmless is "'whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2010) (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)).

The State argues that the trial court's error was harmless because the appellant was engaged in unlawful activity at the time of the shooting. Indeed, the appellant does not dispute that the crime was a felony or that he was a felon in possession of a handgun when he shot the victim. The record reflects that the State introduced a certified copy of the California conviction at the sentencing hearing. The certified copy confirms that the appellant was convicted in 1993 of second degree attempted robbery and received a three-year sentence. "To prevail on the theory of self-defense, a defendant must show that he or she was 'not engaged in unlawful activity' and was 'in a place where the person has a right

---

[2]We question whether the State would have been able to obtain the copy even if the trial court had granted the recess because the State advised the court that "we are just waiting on them to fax us the copy. . . . I don't know if I'll get it tomorrow, I can only hope. But, we've been trying to get it for a week now."

to be.'"  State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013) (citing Tenn. Code Ann. § 39-11-611(b)(1) (2010)).  Therefore, we agree with the State that the trial court's erroneous instruction did not affect the outcome of the trial.

### III.  Conclusion

Based upon the record and the parties' briefs, we conclude that the trial court gave an erroneous jury instruction on self-defense but that the error was harmless.  Therefore, the appellant's convictions are affirmed.

_____
NORMA McGEE OGLE, JUDGE